UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

ANITA CLARK,

       Plaintiff,

v.                                          Case No. 2:12-cv-0045

NATIONWIDE MUTUAL INSURANCE CO.,

       Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

       Pending are cross motions for summary judgment by plaintiff Anita Clark and defendant Nationwide Mutual Insurance Co. ("Nationwide"), each filed on July 27, 2012.[1]  For the reasons that follow, the court grants summary judgment in favor of Nationwide.

I. Background

       This matter arises from Nationwide's denial of Clark's long term disability benefits claim and is before the court pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  Clark is a West Virginia resident who began working for Nationwide on September 21, 1998.

---

[1] The court grants Clark's motion to exceed the page limit for her supporting memorandum of law, filed July 27, 2012.

Admin. Record 37.  While a Nationwide employee, Clark was covered under the Nationwide Insurance Companies and Affiliates Plan for Your Time and Disability Income Benefits ("the Plan"). Compl. ¶ 6; Admin. Record 210.  Clark contends that Nationwide wrongly denied her claim for disability benefits.

A. Plan Language

Nationwide is the "Plan Sponsor."  Admin. Record 224. Nationwide's Board of Directors appoints the members of the "Benefits Administrative Committee."  Id. at 217.  The Benefits Administrative Committee in turn is the "Plan Administrator." Id. at 224.  The Plan Administrator "has the power to take all actions required to carry out the provisions of the Plan."  Id. at 266.  This includes the power and duty "to exercise discretion and authority to construe and interpret the provisions of the Plan, to determine eligibility to participate in the Plan, and make and enforce rules and regulations under the Plan to the extent deemed advisable."  Id.  Further, the Plan Administrator has the power to "decide all questions as to the rights of Participants under the Plan and such other questions as may arise."  Id.  As a result of these provisions, the parties agree that the court's review of the Plan Administrator's decisions is under the abuse of discretion standard.  See Pl.'s Mem. Supp. Mot. Summ. J. 16.

2

The Plan provides qualifying employees with long term disability ("LTD") benefits of 60% of the employee's covered compensation in effect on the Date of the Disability, less any amount provided by certain other benefit plans, including Social Security.  Admin. Record at 246-47.  The Date of Disability is the date an employee "first misses a day of work due to her disability."  Id. at 219.  LTD benefits commence on the first day after 1) Short-Term Disability benefits are exhausted and 2) the claimant then provides written proof of loss and medical evidence that the employee is LTD Disabled.  Id. at 245.

Section 4.03.03 of the Plan sets forth the proof of loss and medical evidence requirements:

(a) To commence LTD Disability Income Benefits, an Active Associate must present evidence to the satisfaction of the Plan Administrator of the following:

(1) that the Active Associate's LTD Disability is the direct and proximate result of an illness,

(2) that, as of the Active Associate's Date of Disability, there is a demonstrated, substantial change in medical or physical condition as the result of a specific physical injury or the specific onset of a physical or mental illness, demonstrated by new, significantly increased physical or mental impairments such as a significant loss of physical functional capacity, and,

(3) that her LTD Disability is an Eligible Disability.

Id. at 246.

3

"LTD Disability" is defined in section 1.34 as

a disability or disablement that results from a substantial change in medical or physical condition as a result of Injury or Sickness and that prevents an Active Associate from engaging in Substantial Gainful Employment for which she is, or may become, qualified.  Continuation of an existing medical or physical condition will generally not constitute a substantial change in medical or physical condition if Claimant previously demonstrated through attendance and/or work that Claimant has been able to engage in Substantial Gainful Employment, or such medical or physical condition could be or has been accommodated.  A substantial change in medical or physical condition may be evidenced by the change or loss of at least one of the Activities of Daily Living.

Id. at 221-23.  The Plan defines Substantial Gainful Employment as being

any occupation or employment from which an individual may receive an income equal to or greater than one-half of such individual's Covered Compensation as of her Date of Disability.

Id. at 225.  When, as found by the Plan here, a LTD Disability is the result of "mood, anxiety, somatoform or other disorder as defined by the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association," benefits have a maximum duration of 36 months.  Id. at 251.

B. Claim History

Clark was 52 years of age when she filed this action, on January 10, 2012.  Compl. ¶ 1.  She began working at Nationwide on September 21, 1998.  Pl.'s Mem. Supp. Mot. Summ. J. 4.  Her initial duty was to assist insurance claims managers; however, she later became an Administrative Service Manager,

4

responsible for building maintenance and supply. _Id._ As
described in a psychiatric evaluation, her duties included
"supervising/managing seven buildings in three different states,
supervising seven (7) people, performing a considerable amount
of driving, monitoring budgeted expenditures and answering
customers as well as department of insurance complaints."
Admin. Record 22.

The precise timeframe is unclear from the record, but
the demands of Clark's job began to increase in response to
budgetary pressures. _Id._ Clark's supervisor told Clark that
she needed to work 12 to 14 hours a day, and on some days Clark
worked longer. _Id._ She had to personally move computers and
other equipment into buildings on occasion, sometimes with the
help of her husband due to her fibromyalgia. _Id._ Despite the
extended hours, she received complaints from managers and was
told to spend more time at work or alternatively to improve her
time management. _Id._ She also began having conflicts with
other employees. Pl.'s Mem. Supp. Mot. Summ. J. 4.

As a result of the increased work demands, Clark began
suffering from anxiety and depression, with which she was
diagnosed on June 21, 2005. _Id._ 4-5. She received psychiatric
treatment and therapy in 2005 and 2006, but the psychiatric
symptoms did not subside and the problems at work escalated.
_Id._ at 5. She requested assistance from a nurse employed by

Nationwide and discussed with the nurse the possibility of modifying her job.  Id.  By Clark's account, the nurse reported that Nationwide denied the modification request because the duties were considered an integral part of the job.  Id.  Clark began on occasion to stutter and to have difficulty articulating herself, and she became increasingly unable to keep up with work demands.  Id.  She received a written reprimand for forgetting to maintain computer records, and her condition further deteriorated.  Admin. Record 22.  Clark first missed work due to her disability on May 29, 2007 (her Date of Disability).  Id. at 2.

Her psychiatrist at the time, Lawrence B. Kelly, M.D., completed the physician's section of her application for Short-Term Disability Benefits on June 8, 2007.  Dr. Kelly diagnosed Clark with Major Depression Recurrent, with symptoms of "[a]nxiety, tearfulness, depression, poor concentration, excessive sleep, reduced activities of daily life."  Admin. Record 5-6.  He selected a box on the form noting that Clark had "significant loss of psychological, physiological, personal and social adjustment (severe limitations)."  Id.  Clark received Short-Term Disability Income Benefits for six months, expiring on November 30, 2007.  See id. at 237-38, 241.

6

C. Plaintiff's Claim for Long Term Disability Benefits

She applied on or around December 6, 2007 for the long term disability benefits that are the subject of this litigation.  Id. at 15; Pl.'s Mem. Supp. Mot. Summ. J. 5. Nationwide informed Clark in a December 7, 2007 letter that she was eligible for LTD benefits beginning December 1, 2007. Admin. Record 1; Pl.'s Mem. Supp. Mot. Summ. J. 6.  A second letter from Nationwide, written on the same day, specified that Clark's diagnosis was categorized as a "mood, anxiety, somatoform or other disorder" and was subject to a 36-month maximum benefit period.  Admin. Record 2.  Both letters were signed by Karen L. Muetzel, identified as the "Absence Management Administrator" for the "Nationwide Associate Service Center."

On January 30, 2008, Nationwide had an independent medical examination of Clark conducted by psychiatrist Mark N. Casdorph, D.O.  Id. at 21.  During her interview with Dr. Casdorph, Clark described how the symptoms had increased with her workload.  She stated, "I can do the job that I took.  I can't do the job they made it into."  Id. at 22.  Dr. Casdorph administered a Test of Memory Malingering, which "assists neuropsychologists in discriminating between bona fide memory-impaired patients and malingerers."  Clark received a "VALID" score, indicating that she did not exaggerate her impairment.

Id. at 24.  Dr. Casdorph reviewed two documents in making his evaluation.  He reviewed the Nationwide Disability Attending Physician Statement, in which Dr. Kelly diagnosed Clark and described her symptoms.  He also reviewed a copy of Dr. Kelley's handwritten response to a question posed by a Nationwide nurse, in which Dr. Kelly wrote that any modifications made to Clark's job should include eliminating complaint handling and contact with a particular coworker.  Id. at 25.

Dr. Casdorph diagnosed Clark with "[d]epressive disorder, not otherwise specified."  Id.  He wrote the following in his evaluation in response to a question on a Nationwide form asking whether Clark is LTD Disabled:

> No - Ms. Clark provides a history of some degree of chronic depression with the degree of impairment that she is alluding to.  This began once she receives a written reprimand from her employer.  The symptoms that she now describes, particularly those regarding changes in cognition, are not consistent with known psychopathology.  Further she made it plain during this interview that her primary stressors began when she was given work assignments in excess of her capabilities.

Id.  He recommended no change in Clark's current treatment or restrictions or modifications to her job description.  Id.

Following the evaluation, Dr. Casdoph's report was forwarded to Clark as outlined in a "Nationwide Staffing Form," dated March 13, 2008.  Id. at 32.  The "Reason for Staffing" is given as "Termination of benefits due to IME [Independent Medical Examination] results."  Id.  The name Gina Lewis appears

8

atop the form in a box specifying the "DMC." Id. Clark believes that this means that Ms. Lewis completed the form, and Clark notes that Ms. Lewis is a Nationwide employee. Pl.'s Mem. Supp. Mot. Summ. J. 8.

In a letter dated March 17, 2008 (the "first denial"), Ms. Muetzel notified Clark that the Disability Assessment Committee had reviewed her claim and terminated her benefits as of April 5, 2008. Admin. Record 43. After providing this conclusion in its first paragraph, the first denial gives the Plan definition of disability and states that the Committee reviewed two documents, the Plan and Dr. Casdorph's evaluation. Id. 43-44. It highlights Dr. Casdorph's conclusion that changes in Clark's cognition "are not consistent with known psychopathology" as well as Clark's interview comment that the primary stressors began when she was given work in excess of her capabilities. Id. at 44. It concludes, "Based on this information, The Committee has determined that you do not meet the definition of Disability under the Plan specifically that you are capable of engaging in Substantial Gainful Employment." Id. The first denial then summarizes procedures for appeal. Id.

### 1. First Appeal

Clark appealed the first denial by letter dated June 16, 2008. Id. at 46. In the letter, she states, "I do not

believe Dr. Casdorph (or any Doctor) is capable of accurately evaluating me, interpreting my action, or translating my statements, during a one hour visit." Id.  She continues,

> If you will check my past Performance Evaluations, I you [sic] will find that I was perfectly capable of performing the duties and requirements as listed in my job description.  During the last few months before I left my position, these duties were steadily increasing in volume and pace; as were the hours required to perform them.

Id.

A July 16, 2008 form completed by Mary Miller, the Secretary to the Benefits Administrative Committee, summarizes the appeal.  Id. at 49.  The first paragraph of the form describes Clark's June 16, 2008 appeal letter, and the second paragraph outlines Dr. Casdorph's evaluation.  Id.  The third paragraph sets forth the Plan's definition of disability, and emphasizes that the "illness must prevent you from engaging in Substantial Gainful Employment."  Id.  It then defines Substantial Gainful Employment (any employment yielding half or more of one's compensation as of the date of disability) and ends with the Committee members' initials, marking the denial of benefits.  Id.

On July 17, 2008, Clark received a letter from Mary Miller denying the appeal (the "second denial").  Id. at 51. The second denial notes that the Committee reviewed the original letter of appeal, "Information contained in Disability Case

10

Management note," Dr. Casdorph's evaluation, and the Plan.  <u>Id.</u>

The second denial then summarizes Dr. Casdorph's evaluation and

the plan provisions, using language largely identical to the

internal July 16, 2008 form.  <u>Id.</u> at 51-52.  It concludes, "This

is the final decision of the administrative review process.  You

have exhausted your appeal rights under [ERISA].  You have the

right to bring a civil action under ERISA Section 502(a)."  <u>Id.</u>

at 52.

  2. Second Appeal

  Clark retained counsel and, nearly two years later on

June 8, 2010, initiated a second appeal.  Pl.'s Mem. Supp. Mot.

Summ J. 9.  She submitted medical records from Dr. Kelly and a

letter dated December 4, 2009 in which he summarized his medical

opinions.  <u>Id.</u> at 9-10.  In the letter, Dr. Kelly wrote,

> Anita Clark . . . has been a patient under my care
> since 06/21/2005.  At that time she was complaining of
> Fibromyalgia pain and depressive symptoms (low energy,
> irritability, poor concentration, crying spell, low
> interest/motivation, anxiety) that reduced her
> functional capacity by 60% - by her estimation.  I
> diagnosed Major Depressive Disorder - inattentive
> type.  She has been treated with a variety of
> medications with only modest response.  The severity
> of her symptoms prevented her from maintaining her
> standard work duties.  The stress of attempting work
> duties only worsened her condition.  Elimination of
> work stress in conjunction with medication and
> psychotherapy has allowed her some improvement in
> mood, concentration, energy, and motivation.  She has
> not had remission of her illness and in my opinion she
> has been and remains totally disabled, due to her
> medical conditions.

Admin. Record 61.  Clark also submitted an August 24, 2009
Social Security decision that found her disabled beginning May
23, 2007; notes of psychological counseling sessions from
Laberta Salamancha, MA; medical records from her primary care
physician at the Living Well Center, W. J. Chapman, D.O.; and
performance management reports regarding her work activities.
Pl.'s Mot. Summ. J. 10.

On July 21, 2010, in response, Mary Miller completed a
form titled "Request to Reopen a Previously Denied Appeal."
Admin. Record at 203.  The first four paragraphs of the form
summarize the evidence Clark provided for her second appeal.
Id. at 203-04.  The following two paragraphs, titled "Research,"
summarize Clark's first appeal and Dr. Casdorph's evaluation.
Id. at 204.  The final section, "Plan's Reason for Denial,"
again provides the definitions of Disability and Substantial
Gainful Employment.  Id.  It states, "your illness must prevent
you from engaging in Substantial Gainful Employment."  Id.

A July 26, 2010 letter (the "third denial") rejects
Clark's second appeal.  Id. at 200.  According to the third
denial, the Committee "reviewed and/or considered" the letter of
appeal; the notes and letter from Dr. Kelly; the favorable
Social Security decision; records from Dr. Chapman at the Living
Well Center; progress notes from Laberta Salamacha, MA; the
performance management reports; Dr. Casdorph's evaluation; and

the Plan.  Id.  The third denial states that the Committee considered but "is not swayed" by the Social Security decision because LTD Disability uses a different standard.  Id. at 200-01.  The Committee reached similar conclusions respecting the Living Well Center records and Dr. Kelly's notes: "[T]he records from the Living Well Center do not address the LTD approved diagnosis of Major Depressive Disorder and the office notes largely address Ms. Clark's standard work duties and do not address the definition of LTD Disability under the Plan."  Id.  By contrast, the Committee found Dr. Casdorph's evaluation persuasive because "it specifically addressed whether Ms. Clark met the definition of LTD Disability under the Plan."  Id.

## II. The Parties' Motions

As noted, Clark initiated this action on January 10, 2012.  Nationwide's March 9, 2012 Answer asserts fourteen defenses, including that Clark improperly named Nationwide as a defendant.  Answer 4.  The pending cross motions for summary judgment then followed.

In her motion for summary judgment, Clark argues that Nationwide's denial of her LTD benefits was not the result of a deliberate and principled reasoning process because the three decisions consist of "simple regurgitations" of Dr. Casdoph's evaluation and citations to Plan language.  Pl.'s Mem. Supp. Mot. Summ. J. 17.  She further contends that the denial is not

supported by substantial evidence because it places too great an emphasis on Dr. Casdoph's report and fails to address evidence favorable to Clark, such as the social security decision.  Id. at 18-19.

Nationwide responds by emphasizing that the abuse of discretion standard applies for the court's review of the Plan Administrator's decision to deny benefits.  Def.'s Opp'n Pl.'s Mot. Summ. J. 6.  Nationwide argues that it was not required to defer to the Social Security ruling and that it properly weighed Dr. Casdorph's independent evaluation.  Id. at 9.  It highlights the thoroughness of Dr. Casdoph's method, and notes deficiencies in various aspects of alternative evidence.  Id. at 11.  Consequently, it seeks summary judgment on the merits.

Nationwide also moves for summary judgment on the ground that it is an improper defendant for the action in that it is not the Plan.  Def.'s Mot. Summ. J. 1.  In addition, it asserts that the plan specifies a one-year limitations period for challenging the denial of benefits and that Clark failed to challenge the denial of her claim within that period.  Id.

In response, Clark contends that Nationwide, through its continued litigation of this case, has waived any claim that it is an improper defendant.  Pl.'s Opp'n Def.'s Mot Summ. J. 2.  Alternatively, Clark argues that Nationwide became a proper defendant due to its direct involvement with her claim's denial.

14

<u>Id.</u>  Regarding the statute of limitations, Clark argues that Nationwide imprudently seeks a ruling by the court that the limitations period expired before she was able to file suit. Clark asserts that the Plan is ambiguous in that a three year limitations period applied when she became disabled, whereas the one year limitations period to which Nationwide refers did not become part of the Plan until it was added by amendment in October, 2009.  <u>Id.</u> at 3.  Clark adds that a one year limitation is in any event contrary to West Virginia public policy.  <u>Id.</u>

### III. The Governing Standard

It is the plaintiff's burden to demonstrate entitlement to benefits under an ERISA plan.  <u>Ruttenberg v. U.S. Life Ins. Co.</u>, 413 F.3d 652, 663 (7th Cir. 2005) (cited in <u>Donnell v. Metro. Life Ins. Co.</u>, 165 F. App'x. 288, 296 n.9 (4th Cir. 2006)).

"Judicial review of an ERISA plan administrator's decision is 'under a <u>de novo</u> standard unless the plan provides to the contrary.'"  <u>Carden v. Aetna Life Ins. Co.</u>, 559 F.3d 256, 259-60 (4th Cir. 2009) (quoting <u>Metro. Life Ins. Co. v. Glenn</u>, 128 S.Ct. 2343, 2348 (2008)).  Where, however, the plan gives the administrator discretion to determine benefit eligibility or to construe plan terms, the review is conducted under the abuse of discretion standard.  <u>Glenn</u>, 128 S.Ct. at 2348; <u>Carden</u>, 559 F.3d at 260.

At its "immovable core," the abuse of discretion standard requires that a court not overturn a plan administrator's decision "merely because it would have come to a different result in the first instance." Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 322 (4th Cir. 2008). Our court of appeals has set forth a "more particularized conception" of the abuse of discretion standard to be applied in the ERISA context. Id. First, the abuse of discretion standard "equates to reasonableness" and an ERISA administrator's discretionary decision should be not overturned if it is reasonable. Id. Second, the reasonableness standard is less deferential than an "arbitrary and capricious standard." Id. "[T]o be unreasonable is not so extreme as to be irrational." Id. Third, a "decision is reasonable 'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" Id. (quoting Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788 (4th Cir.1995)). And finally, "the decision must reflect careful attention to 'the language of the plan,' as well as the requirements of ERISA itself." Id. (quoting Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 342 (4th Cir. 2000)).

Booth sets forth these considerations in a nonexclusive list of factors to be weighed in conducting an ERISA abuse of discretion review:

16

> (1) the language of the plan; (2) the purposes and
> goals of the plan; (3) the adequacy of the materials
> considered to make the decision and the degree to
> which they support it; (4) whether the fiduciary's
> interpretation was consistent with other provisions in
> the plan and with earlier interpretations of the plan;
> (5) whether the decisionmaking process was reasoned
> and principled; (6) whether the decision was
> consistent with the procedural and substantive
> requirements of ERISA; (7) any external standard
> relevant to the exercise of discretion; and (8) the
> fiduciary's motives and any conflict of interest it
> may have.

Booth, 201 F.3d at 342-43.  Of particular note is the eighth

factor, respecting conflicts of interest, such as when an

administrator serves in the dual role of evaluating and paying

benefit claims.  See, e.g., Williams v. Metro. Life Ins. Co.,

609 F.3d 622, 632 (4th Cir. 2010).  Previously, our circuit had

used a modified abuse of discretion standard to account for a

conflict of interest.  Carden, 559 F.3d at 259-61.  Following

the Supreme Court's decision in Glenn, "a conflict of interest

became[] just one of the 'several different, often case-

specific, factors' to be weighed together in determining whether

the administrator abused its discretion."  Carden, 559 F.3d at

259-61 (quoting Glenn, 128 S. Ct. at 2351).  The weight accorded

to the conflict "depend[s] largely on the plan's language and on

consideration of other relevant factors."  Id. at 261.

     There are compelling reasons for the deferential

standard of review, not the least of which is that it

"'ensure[s] that administrative responsibility rests with those

whose experience is daily and continual, not with judges whose

exposure is episodic and occasional.'"  Brogan v. Holland, 105

F.3d 158, 161, 164 (4th Cir. 1997) (quoting Berry v. Ciba-Geigy

Corp., 761 F.2d 1003, 1006 (4th Cir. 1985)); Lockhart v. United

Mine Workers of Am. 1974 Pension Trust, 5 F.3d 74, 77 (4th Cir.

1993) ("[The] dispositive principle remains . . . that where

plan fiduciaries have offered a reasonable interpretation of

disputed provisions, courts may not replace it with an

interpretation of their own.").

        Nevertheless, there are circumstances where a

reviewing court will direct an administrator to have another

look at a claim through the device of remand.  The circumstances

justifying a remand, however, are quite exceptional:

> If the court believes the administrator lacked
> adequate evidence on which to base a decision, "the
> proper course [is] to 'remand to the trustees for a
> new determination,' not to bring additional evidence
> before the district court."  As we have previously
> indicated, however, "remand should be used sparingly."
> Remand is most appropriate "where the plan itself
> commits the trustees to consider relevant information
> which they failed to consider or where [the] decision
> involves 'records that were readily available and
> records that trustees had agreed that they would
> verify.'"  The district court may also exercise its
> discretion to remand a claim "where there are multiple
> issues and little evidentiary record to review."

Elliott v. Sara Lee Corp., 190 F.3d 601, 609 (4th Cir. 1999)

(citations and quoted authority omitted); Berry, 761 F.2d at

1008 ("The case for a remand is strongest where the plan itself

commits the trustees to consider relevant information which they

failed to consider or where decision involves 'records that were

18

readily available and records that the trustees had agreed that

they would verify.'" (quoting Le Febre v. Westinghouse Elec.

Corp., 747 F.2d 197, 204, 206 (4th Cir.1984))).


## IV. Analysis

The parties agree that the Plan grants the Plan

Administrator the power to "exercise discretion and authority to

construe and interpret the provisions of the Plan."  Admin.

Record 266.  The court reviews any decisions made pursuant to

that authority for abuse of discretion.

### A. Improper Defendant

With respect to Nationwide's contention that it should

be dismissed as an improper defendant in this case, Nationwide

cites Gluth, as does the plaintiff.  In Gluth, an unpublished

per curiam opinion, it was noted that the plaintiff "named the

wrong defendant from the beginning by initially bringing this

action against his employer, Wal-Mart, who had no control over

the administration of the Plan."  Gluth v. Wal-Mart Stores,

Inc., No. 96-1307, 1997 WL 368625, at *6 n.8 (4th Cir. July 3,

1997).  Gluth concluded that Wal-Mart waived the defense by

proceeding with the litigation without moving for a dismissal on

that basis.  Id.  The Order and Notice in this case directed

parties to file motions to dismiss by April 2, 2012.  While

Nationwide did not move to dismiss, it raised this very defense

in its Answer and presented it in its motion for summary judgment, which came at a relatively early stage as in most ERISA cases.  The argument does not appear to have been waived.

However, Nationwide's apparent control over Clark's claim justifies Nationwide being named as a defendant.  See id. (noting that Wal-Mart was initially an improper defendant in part because it "had no control over the administration of the Plan.").  The record shows a "Nationwide Staffing Form" which summarizes Clark's claim and recommends denial.  Admin. Record 32.  As Clark points out, the form does not mention the designated Plan Administrator, which is the Benefits Administrative Committee.  Pl.'s Mem. Supp. Mot. Summ. J. 14. Additionally, Karen Muetzel, the Absence Management Administrator for Nationwide Insurance Company, appears throughout the transcript and authored the first denial.  Id. (citing Admin. Record 43-45).

Clark also emphasizes that that the secretary of the Benefits Administrative Committee later emailed Ms. Muetzel to request Clark's file and to inquire why Clark had been terminated.  Id. (citing Admin. Record 40).  This suggests that Nationwide and not the Benefits Administrative Committee may have taken the lead on Clark's initial denial.  Finally, Ms. Muetzel's email correspondence concerning Clark's claim prominently display the Nationwide logo, and the second denial

is drafted on Nationwide letterhead.  Admin. Record 40-42, 51-
52.  Nationwide appears to have had adequate control over
Clark's claim to justify being named as the defendant.[2]

B. The Limitations Period

The Plan contains two limitations provisions.  Section
10.11 provides a three year limitations period:

> No action at law or in equity may begin prior to 60
> days after the Plan Administrator receives a valid
> written proof of loss.  No such action may begin after
> three years from the day written proof of loss was
> required.

Admin. Record 269.  Effective October 12, 2009, the Plan was
amended to include Section 10.13, which contains a limitations
provision with a one-year period:

> All current and former Plan participants shall have 1
> year from the date an expense is incurred or from
> which benefits could have commenced under the terms of
> the Plan to commence legal action related to the
> benefits provided under the Plan.

Id. at 290.  LTD benefits can commence on the first day after a
claimant has exhausted Short-Term Disability benefits and
provided proof of continued disability.  Id. at 245.

ERISA contains no express statute of limitations
provision and does not specify when a limitations period should
begin to run.  White v. Sun Life Assurance Co. of Can., 488 F.3d

---

[2] Nationwide also makes a one-sentence argument that dismissal is
required by Federal Rule of Civil Procedure 12(b)(7) because
Clark has failed to join necessary parties.  Def.'s Mem. Supp.
Summ. J. 11.  The Order and Notice deadline for motions to
dismiss expired on April 2, 2012.

240, 245 (4th Cir. 2007); see also 29 U.S.C. § 1132.  Courts will enforce a valid contractual provision in the plan documents governing limitations if the provision sets forth a reasonable period.  White, 488 F.3d at 250; see also Order of United Commercial Travelers v. Wolf, 331 U.S. 586, 608 (1947) ("[I]t is well established that, in the absence of a controlling statute to the contrary, a provision in a contract may validly limit, between the parties, the time for bringing an action on such contract to a period less than that prescribed in the general statute of limitations, provided that the shorter period itself shall be a reasonable period.").  Absent a valid contractual provision, courts borrow the state law limitations period applicable to claims most closely related to the federal cause of action.  White, 488 F.3d at 245.

        Regarding the time from which the limitations period should be run, the general rule is that "'[a]n ERISA cause of action does not accrue until a claim of benefits has been made and formally denied.'"  Id. at 246 (quoting Rodriguez v. MEBA Pension Trust, 872 F.2d 69, 72 (4th Cir. 1989)).  "[T]he statute of limitations begins to run at the moment when the plaintiff may seek judicial review, because ERISA plaintiffs must generally exhaust administrative remedies before seeking judicial relief."  Id. at 245-46.  Nationwide concedes that the limitations period begins to run with the final decision denying

22

the claimant's benefits.  Def.'s Mot. Dismiss 12.  Here, that date is July 26, 2010.

Nationwide asserts that Clark's claim is subject to the one-year limitations provision found in section 10.13. Section 10.13 runs the limitations period from the date the benefits could have commenced, which as stated above, is the first day after a claimant has exhausted Short-Term Disability benefits and provided proof of continued disability.  Id. at 245.  Clark's Short-Term Disability Benefits ended on November 30, 2007 and she submitted a disability statement signed by Dr. Kelly on December 6, 2007.  Id. at 15-16.  The date the LTD benefits "could have commenced" under the Plan therefore appears to be December 7, 2007.

Since accrual on that date would be inconsistent with the Fourth Circuit's holding that a limitations period may not begin prior to a claim's final denial, see White, 488 F.3d at 246, Nationwide requests that the limitations period be deemed tolled until the final denial of Clark's benefits.  Def.'s Mem. Supp. Mot. Summ. J. 12.  Nationwide denied Clark's final appeal on July 26, 2010.  Inasmuch as Clark filed the complaint well over a year later on January 10, 2012, Nationwide contends that the claim is stale when timed one year from the final denial of benefits.  Id.

23

Clark argues that section 10.13 should be voided
because it conflicts with the three-year provision of section
10.11.  Pl.'s Opp'n Def's Mot. Summ. J. 5.  She contends that it
is unclear which provision's limitations period should control.
Id.  She adds that only section 10.11 was in effect when she
initially applied for and received long term disability
benefits; the Plan was amended to include section 10.13 nearly
two years later, effective October 12, 2009.  Id. at 5 & n.1.

In light of this alleged ambiguity, Clark cites
Gallagher v. Reliance Standard Life Ins. Co. for the proposition
that "[a]ny ambiguity in an ERISA plan 'is construed against the
drafter of the plan, and it is construed in accordance with the
reasonable expectations of the insured.'"  305 F.3d 264, 269
(4th Cir. 2002) (quoting Bynum v. Cigna Healthcare of N.C.,
Inc., 287 F.3d 305, 313-14 (4th Cir. 2002)).  She asserts that
the conflict should be resolved against Nationwide's interests
and that section 10.11's longer three-year limitations period
should control.  Pl.'s Opp'n Def.'s Mot. Summ. J. 5.

Nationwide disputes the premise that the two
limitations provisions conflict.  Def.'s Reply Supp. Mot. Summ.
J. 6.  It explains that section 10.11's three-year period is
"applicable to any type of claim," whereas the one-year period
of section 10.13 applies only to "legal action[s] related to the
benefits provided under the Plan."  Def.'s Reply Supp. Mot.

Summ. J. 6.  Also, Nationwide contends that the Plan
Administrator can waive the one-year period, while the three-
year period is inflexible.  Id.

        The court observes that Nationwide's Plan
interpretation warrants de novo review in this instance.  While,
as discussed above, the Plan Administrator's decisions are
accorded discretion, Nationwide's interpretation of the
limitations provisions does not appear to be based on a Plan
Administrator decision.  Since neither party has requested that
the court remand the action to seek the Plan Administrator's
formal interpretation, the court proceeds with a de novo review
of the plan language.

        When interpreting an ERISA health insurance plan de
novo, the court applies "ordinary principles of contract law,
enforcing the plan's plain language in its ordinary sense."
Wheeler v. Dynamic Eng'g, Inc., 62 F.3d 634, 638 (4th Cir.
1995).  Ambiguous terms are therefore construed "against the
drafter" and "in accordance with the reasonable expectations of
the insured."  Id.[3]

---

[3] As stated above, Clark cites Gallagher, 305 F.3d at 269, for
this proposition.  The court observes that Gallagher quotes the
proposition from Bynum v. Cigna Healthcare of North Carolina,
Inc., 287 F.3d 305 (4th Cir. 2002), which in turn used it in the
context of curbing a plan administrator's discretion when a
conflict of interest exists.  Id. at 311, 313-14.  The Fourth
Circuit has since concluded that the Supreme Court's decision in
Glenn "foreclose[d]" the rule whereby a conflict of interest

The court must also take into account the special considerations that attach in the ERISA context.  Our court of appeals has enthusiastically endorsed the ability of plans to set limitations periods.  <u>White</u>, 488 F.3d at 250 ("We could not agree more that ERISA generally affords plans the flexibility to set limitations periods, nor do we take issue with those decisions enforcing contractual limitations periods of varying lengths.").  It has reasoned that "[p]lans may legitimately wish to avoid extended limitations periods, because the disability status of a particular plaintiff may shift significantly over time, and because both the interests of claimants and a plan's own accounting mechanisms may be served by prompt resolution of claims."  <u>Id.</u>  The limitations period must, however, provide fair notice to claimants.  <u>Id.</u>

The court finds the Plan's limitations provisions are ambiguous and should be construed to allow for the longer three-year period.  Nationwide's attempted reconciliation of section 10.11 and section 10.13 is not convincing.  Even if, as Nationwide argues, section 10.13 applies only to legal actions related to benefits, nothing in section 10.11 indicates that its three-year period does not apply to those some actions.  Moreover, as formatted in the version on the record, section

---

necessarily curbs discretion.  <u>Carden</u>, 559 F.3d at 260.
Nevertheless, this pro-insured approach to construction appears, at a minimum, to have continued viability where no discretion is warranted and the court conducts <u>de novo</u> review, as was the context of <u>Wheeler</u>.

10.13 is buried in an amendment to the Plan, thirty-one pages behind the ostensibly controlling three-year period of section 10.11. Section 10.11 does not direct the reader to section 10.13 or otherwise indicate that other provisions might modify the three-year limitations period. The ambiguous language and indirect construction of the Plan did not give Clark fair notice that her claim faced a one-year limitations period. She is therefore bound only by the three-year provision of section 10.11.

Having found that section 10.13's limitations period is inapplicable, the court need not consider Clark's argument that a one-year limitations period is contrary to West Virginia public policy. Additionally, the court need not consider the parties' thoroughly briefed arguments regarding how the court should treat limitations provisions that designate invalid accrual times -- i.e., accrual before the final denial of benefits. Nationwide had advocated retaining the Plan's limitations period but tolling accrual until the final claim denial, whereas Clark had advocated replacing the Plan limitation provision in its entirely with the West Virginia Code's five or ten year limitations period. Given the court's determination that the three-year period of section 10.11 applies under the circumstances of this particular case and is deemed to run from the date of final denial of benefits, Clark has timely filed this action.

27

## C. Denial of the Claim

The determination to deny Clark's benefits was made pursuant to the Plan Administrator's discretion, so the court reviews the decision using the abuse of discretion standard in view of the factors from <u>Booth</u>.  The parties' arguments principally concern the first, third, and fifth <u>Booth</u> factors.

### 1. The First Factor: the Plan Language

Regarding the first <u>Booth</u> factor, the Plan language, the parties dispute the meaning of a provision relating to Social Security determinations.  Section 4.05.02(a) provides in pertinent part as follows:

> [T]he maximum period of LTD Disability Income Benefits based on months of continuous disability coverage is as follows:
>
> *   *   *
>
> (ii) For Disabilities that commence on or after January 1, 2005:

| Months of Continuous Disability Coverage | Maximum Period of Disability Income Benefits |
|---|---|
| 1-12 months | 12 months |
| 13-24 months | 24 months |
| 25-36 months | 36 months |
| 37-48 months | 48 months |
| 49-60 months | 60 months |
| 61 or more months | To age 65 |

> (iii) Notwithstanding (ii) above, if the Disabled Employee or Disabled Person is approved for Social Security disability income benefits ("SSDI"), benefits under the Long-Term Disability Income Benefits Program will recommence from date of [sic, the] award is issued until age 65, subject to the requirements of Section 4.05.01 [that she remain LTD Disabled].

Clark argues that under the plain language of section
4.05.02(a)(iii), her favorable Social Security determination
entitles her to LTD Benefits.  Pl.'s Mem. Supp. Mot. Summ. J.
20.  She contends that her Plan benefits "recommence"
automatically with the Social Security ruling, regardless of the
Plan Administrator's previous denial.  Nationwide argues that
Clark misreads the provision by ignoring its context within the
Plan and its relation to the subsections it references.  Def.'s
Opp'n Pl's Mot. Summ. J. 6-7.  Nationwide contends that the
provision relates only to the duration of benefits, and is
irrelevant to Clark's claim.

        The court finds, and Clark all but acknowledges, that
Nationwide's interpretation is correct.  See Pl.'s Reply Supp.
Mot. Summ. J. 7 ("While the Defendant may have a legitimate
argument that the Plaintiff is not entitled to benefits based on
the Social Security section, said section is nonetheless in the
Plan and is worthy of discussion.").  Section 4.05.02 concerns
the maximum duration for an employee's LTD Disability benefits,
not the employee's initial eligibility.  Subsection (a)(ii)
provides the maximum period of benefits based on an employee's
total months of coverage under the Plan.  Admin. Record 250.
For example, (a)(ii) states that an employee with only 12 months
of coverage is limited to a maximum period of benefits of one
year, whereas an employee with as much as "61 or more months" of
coverage has a maximum period of benefits "To age 65."  Id.

29

The language "Notwithstanding (ii) above" in subsection (a)(iii) operates to reinstate benefits that have reached their maximum period and expired.  Such was not the case with Clark's benefits.  Since Clark had belonged to the Plan for more than 61 months at the time of her claim, subsection (a)(ii) already specified that her maximum duration of benefits was until age 65, the same age to which (a)(iii) permits an extension if Social Security disability income benefits are awarded.[4]

Subsection (a)(iii)'s instruction that it be applied "subject to the requirements of Section 4.05.01" also contradicts Clark's interpretation.  Section 4.05.01 lists the requirements with which an LTD Disabled claimant must comply for continued receipt of benefits.  Admin. Record 249-50.  The foremost requirement is that a claimant must continue to be LTD Disabled.  The Plan Administrator's finding that Clark was not LTD Disabled cannot be upset by a provision whose operation is contingent on a claimant being LTD Disabled.  A plain reading of the Plan language shows that Clark's position respecting section 4.05.02(a)(iii) is untenable.

---

[4] If, as was originally found, the plaintiff's disability is the result of a mood, anxiety, or somatoform disorder, section 4.05.03 of the Plan specifically limits the maximum duration of LTD Disability Income Benefits to 36 months.  It is noted that "schizophrenia and other psychotic disorders" are excluded from this limitation.

In her reply brief, Clark makes the additional argument that even if section 4.05.02(a)(iii) is inapplicable to her claim, Nationwide's denial letters should have included a discussion of the provision.  Inasmuch as the provision's language is clear and Clark did not rely on the provision in presenting her original claim or appeals, the court finds no error in the lack of discussion in the denial letters.

### 2. The Fifth Factor: Whether the Decisionmaking Process Was Reasoned and Principled

Turning to the fifth <u>Booth</u> factor, Clark argues that Nationwide's denial of her LTD Benefits was not the result of a deliberate and principled reasoning process.  Clark contends that the initial denial of benefits and the two subsequent denials of her appeals each "show simple regurgitations of one or two sentences by Dr. Casdorph and thereafter . . . simply cite[] Plan provisions."  She further disputes Nationwide's explanation, found in the third denial, that it accorded Dr. Casdorph's findings greater weight because he "specifically addressed" the Plan definition of LTD Disability.  Pl.'s Mem. Supp. Mot. Summ. J. 17.  She believes that the explanation "twists the facts to justify the ends" because Dr. Casdorph did not specifically address why Clark failed to meet the plan definition.  <u>Id.</u>

When reviewing evidence of a claimant's disability, "it is not an abuse of discretion for a plan fiduciary to deny

31

. . . benefits where conflicting medical reports are presented."
Elliott, 190 F.3d at 606.  Nor are plan administrators required
to give special weight to the opinions of treating physicians
over other credible opinions and records.  See Black & Decker
Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  When
reviewing decisions of plan administrators, district courts
"have no warrant to require administrators automatically to
accord special weight to the opinions of claimant's physician;
nor may courts impose on plan administrators a discrete burden
of explanation when they credit reliable evidence that conflicts
with a treating physician's evaluation."  Id.  Nonetheless,
"[p]lan administrators, of course, may not arbitrarily refuse to
credit a claimant's reliable evidence, including the opinions of
a treating physician."  Id.

        The court finds Nationwide's reasoning process to be
adequate; Clark's contentions rely on a far too shortsighted
reading of the decision letters and Dr. Casdorph's evaluation.
Dr. Casdorph sufficiently sets forth his reasons for concluding
that Clark is not LTD Disabled.  Clark asserts that Dr. Casdorph
"simply circled the word 'no'" on the evaluation request form
but ignores that Dr. Casdorph's separate written evaluation
concludes with a discussion of the form's questions.  Admin.
Record 25-26.  In that evaluation, Dr. Casdorph answers that he
does not believe that Clark is LTD Disabled and offers two
reasons.

The first reason, that "the symptoms that [Clark] now describes . . . are not consistent with known psychopathology," is somewhat ambiguous in import regarding the definition of LTD Disabled.  Dr. Casdorph's second reason remedies the deficiency. He states that Clark "made it plain during this interview that her primary stressors began when she was given work assignments in excess of her capabilities."  While a direct reference to Plan provisions might have been helpful, it is clear, if not explicit, that Dr. Casdorph found Clark to be capable of "Substantial Gainful Employment," and therefore not LTD Disabled.

The content of Dr. Casdorph's evaluation supports this finding.  He outlines in detail Clark's account of how her gradually increased job duties brought on her symptoms.  He quotes her as stating in her interview, "I can do the job I took.  I can't do the job they made it into." Id. at 22.  Clark thus unequivocally told Dr. Casdorph that despite her current symptoms, she would be able to perform her original duties, and accordingly, he concluded that she was capable of Substantial Gainful Employment.

Nationwide more directly sets forth the reasoning in its denial letters.  The first denial, for example, quotes the definition of LTD Disability and specifies, "As stated in the definition of Disabled, your illness must prevent you from

33

engaging in Substantial Gainful Employment." It then defines Substantial Gainful Employment (any employment yielding half or more of one's compensation as of the date of disability) and quotes Dr. Casdorph's conclusions, including the statement that the stressors began with Clark's increased workload. Finally, and definitively, the letter concludes, "The Committee has determined . . . specifically that you are capable of engaging in Substantial Gainful Employment."

The second denial parallels the first denial letter and again highlights the definition of Substantial Gainful Employment. No additional explanation was necessary given that Clark's June 16, 2008 letter of appeal only reinforced the Plan Administrator's decision: Clark reiterates in the appeal that she "was perfectly capable of performing the duties and requirements as listed in my job description" and left as a result of her duties "steadily increasing in volume and pace." Id. at 46. The third denial similarly explains that "based on the [independent medical examination] conducted by Dr. Casdorph, the BAC upheld their initial decision based [on] the following Plan provisions," thereafter providing the definition of LTD Disability and highlighting Substantial Gainful Employment. Id. at 201.

The denial letters could have more expressly paired aspects of Dr. Casdorph's evaluation to the Plan Administrator's

finding that Clark was capable of Substantial Gainful Employment.  The second denial could have highlighted that Clark's appeal letter suggested her misunderstanding of the Plan's definition of disability.  Nonetheless, the reason for the denial and the factual basis thereof are clear.  The letters' shortcomings do not indicate that the underlying decisions arose without a deliberate and principled reasoning process.

Clark further argues that Nationwide's treatment of her favorable evidence was not the result of a deliberate and principled reasoning process.  She contends that Nationwide imposed an "unreasonable double standard" by discounting her evidence for not specifically addressing why she met the Plan definition of disability.  Pl.'s Mem. Supp. Mot. Summ. J. 18.  As discussed above, and contrary to Clark's assertion, it is apparent that Dr. Casdorph based his conclusion that Clark is not LTD Disabled on his knowledge of specific Plan provisions, particularly the definition of Substantial Gainful Employment.  By contrast, Clark's evidence suffers from deficiencies and contradictions, which the third denial adequately describes.

Regarding Dr. Chapman's records from the Living Well Center, the third denial explains that "the records from the Living Well Center do not address the LTD approved diagnosis of Major Depressive Disorder."  Admin. Record 201.  This is

supported in the record.  Clark acknowledges in her second
letter of appeal that Dr. Chapman's records only show that Dr.
Chapman was "aware of Mrs. Clark's treatment with Dr. Kelly and
Mrs. Clark's inability to work."  Id. at 54.  The relevant
records specify Major Depressive Disorder as an ongoing ailment,
list the medications taken "per Dr. Kelley [sic]," and state
that Clark is "continuing to follow up with Dr. Kelly."  Id. at
106, 117, 122, 132.  The entries continue,

> Assessment & Plan Reviewed today and discussed with
> patient to continue current course of action; pt is
> following with dr Kelly he is currently adjusting her
> meds pt is still no stable for the workplace will keep
> off work for now and pt is to continue following with
> dr Kelly.

Id.  This merely relates Clark's description of Dr. Kelly's
treatment and does not represent an independent conclusion
from Dr. Chapman.  Also, whether Clark is able to return to
her current position is of little consequence because
Substantial Gainful Employment by definition includes less
demanding positions.

        Apart from that entry, the Living Well Center records
describe various ailments which are irrelevant to Clark's Major
Depressive Disorder diagnosis.  For example, multiple records
chronicle treatment for complaints such as migraines, cough,
abdominal pain, upper respiratory infection, headaches,
hypothyroidism, and edema.  E.g., id. at 122-28; 133, 137-38.
Further, records describing Clark's "General Status" as "Mood

appropriate" with "No Distress" could be considered contrary to a finding of disability.  See, e.g., id. at 121, 126, 131, 136.

Regarding Dr. Kelly's findings, the third denial states that "the office notes largely address Ms. Clark's standard work duties and do not address the definition of LTD Disability under the Plan."  Admin. Record 201.  Clark criticizes this explanation because it "does not even mention" Dr. Kelly's December 4, 2009 opinion letter.  The court finds no fault with the Plan Administrator's treatment of Dr. Kelly's materials.  The third denial discusses Dr. Kelly's notes, and it states that it "reviewed and/or considered" Dr. Kelly's letter. Because Dr. Kelly's notes and letter are different formulations of the same underlying medical opinions, consideration of the notes necessarily involves consideration of the letter.  Admin. Record 200.  This is especially evident given that Dr. Kelly's handwritten notes are rather illegible, and the third denial appears to have taken the phrase "standard work duties" directly from Dr. Kelly's letter.  See id. at 62-69.

Additionally, the court finds reasonable the Plan Administrator's decision to deemphasize Dr. Kelly's finding for addressing "standard work duties" rather than "the definition of LTD Disability under the Plan."  Dr. Kelly's conclusions appear to relate to Clark's job as she left it and not lesser responsibilities that might constitute Substantial Gainful

37

Employment.  As Nationwide points out, Dr. Kelly's June 22,
2007; July 06, 2007; October 8, 2007; and December 6, 2007
reports opine that Clark was capable of returning to work with
modification.  Admin. Record 9-10, 14, 16.  Read in the context
of his statements about "standard work duties," the conclusion
of Dr. Kelly's December 4, 2009 letter that Clark "has been and
remains totally disabled" can fairly be interpreted to mean
merely that she remains unable to perform her standard job work
duties.  Such an understanding is consistent with Dr. Kelly's
previous opinions as well as Clark's own statement that she
became unable to do her job once the responsibilities were
increased, and it leaves open the possibility that she could
engage in Substantial Gainful Employment.

Further, the Plan Administrator was not obligated to
give increased weight to the opinions of Clark's treating
physicians.  See Nord, 538 U.S. at 834.  As a result, even had
Dr. Kelly unequivocally opined that Clark was unable to perform
work in any capacity, that opinion would not have precluded the
Plan Administrator from denying Clark's benefits.  See Elliott,
190 F.3d at 606 ("Even if Dr. Liesegang's report suggested that
Elliott could perform no work at all, that fact would not
preclude the Plan Administrator from denying benefits.").

Finally, in reference to Clark's favorable Social
Security Disability determination, the third denial states that

"the Committee is not swayed because an LTD Disability is of a different standard than Social Security's standard and as you point out the definitions differ." Admin. Record 201. Clark's second letter of appeal acknowledged the different standards in particular with respect to continuation of existing conditions. Id. at 54.

Also, as Nationwide notes, the Social Security determination relied on a different evidentiary foundation. Unlike a Plan Administrator, the Administrative Law Judge ("ALJ") reviewing Clark's claim was required to give special deference to Clark's treating physician. Additionally, the ALJ did not have available for consideration the Plan Administrator's principal evidence, Dr. Casdorph's report. Instead, the ALJ considered the opinion of Dr. Boggess, who as a non-examining source appears to have based his opinion exclusively on Clark's existing medical records. Consequently, Nationwide points out that had the ALJ also considered Dr. Casdorph's opinion, Social Security regulation would have required the ALJ to give Dr. Casdorph's examining physician opinion more weight than Dr. Boggess's non-exmaining physical opinion. Def.'s Mem. Supp. Mot. Summ. J. 18.

Because the Plan did not tie the award of benefits to Social Security determinations, the Plan Administrator had the discretion to give limited weight to Clark's favorable Social

Security determination based on these distinctions.  See Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1314 n.8 (11th Cir. 1999) ("[T]he approval of disability benefits by the Social Security Administration is not considered dispositive on the issue of whether a claimant satisfies the requirement for disability under an ERISA-covered plan.").

In sum, the Plan Administrator fairly considered evidence both favorable to and unfavorable to Clark's claim. While the Plan Administrator could have better articulated its decision letters and provided additional details, the explanations are sufficiently clear and, as indicated from the record, appear to have arisen from a deliberate and principled reasoning process.

### 3. The Third Factor: the Adequacy of the Materials Considered to Make the Decision

Turning to the third Booth factor, Clark next contends that the decision is not supported by substantial evidence.  She argues that the Plan Administrator placed too great an emphasis on Dr. Casdoph's two year old report, which could not alone constitute substantial evidence.  Substantial evidence is that "which a reasoning mind would accept as sufficient to support a particular conclusion."  DuPerry v. Life Ins. Co. of N. Am., 632 F.3d 860, 869 (4th Cir. 2011).  It has been described as "more than a scintilla, but less than a preponderance."  Hensley v. Int'l Bus. Mach. Corp., 123 F. App'x. 534, 536 (4th Cir. 2004).

The evidence on the record is sufficient to support the Plan Administrator's determination.  Dr. Casdorph's report is based on a thorough review of Clark's medical history, an extensive interview, and psychological testing administered by his assistant.  The five-page, single-spaced report summarizes that evidentiary basis before adequately setting forth resulting diagnostic impressions.  It is inconsequential that Dr. Casdorph's evaluation was over two years old at the time the second appeal was denied.  Plan section 4.03.03(a)(2) requires that a medical or physical condition be present "as of the Active Associate's Day of Disability," which as defined by section 1.18(a) is "the date an Active Associate first misses a day of work due to her disability."  Admin. Record 219, 246.  The question continued to be whether Clark was disabled as of May 29, 2007, the date she initially missed work.

Moreover, contrary to Clark's assertion, Dr. Casdorph's report is not the only supporting evidence on the record.  Dr. Kelly's 2007 opinions repeatedly concluded that Clark's condition required only job modifications.  Similarly Clark's own statements regarding the stresses of additional responsibilities, made to Dr. Casdorph and again in her first letter of appeal, indicated her belief that she could perform her original duties.  Clark casts further doubt on her claim's legitimacy with an April 12, 2006 response on her therapist's personal history form: she answered that a goal of therapy was

41

to "get me to retirement, early or medical or something."

Admin. Record 149.  The Plan Administrator possessed sufficient

evidence reasonably to deny Clark's benefits.  Remand for review

of further evidence is justified only in exceptional

circumstances and is inappropriate here.  See Elliott, 190 F.3d

at 609.

### 4. Other Factors

Two other Booth factors merit attention.  Regarding

the sixth factor, a plan administrator substantially complies

with ERISA's procedural requirements when it has "supplied the

beneficiary 'with a statement of reasons that, under the

circumstances of the case, permitted a sufficiently clear

understanding of the administrator's position to permit

effective review.'"  Brogan, 105 F.3d at 165 (quoting Donato v.

Metro. Life Ins. Co., 19 F.3d 375, 382 (7th Cir. 1994)).  As

discussed above in reference to the Plan Administrator's

reasoning process, the denial letters adequately set forth the

reasons for denial to permit effective review.

Regarding the eighth Booth factor, the court notes

that a conflict of interest is present.  The record, however,

indicates no sign of biased decision making, and Nationwide's

willingness to consider an appeal beyond that which the Plan

required gives extra credence to the determination.  Champion v.

Black & Decker (U.S.) Inc., 550 F.3d 353, 362 (4th Cir. 2008

42

("This second appeal, which was not required by the Plan
language, increased the likelihood of an accurate final
decision, thereby also reducing the conflict factor 'to the
vanishing point.'" (quoting Glenn, 128 S.Ct. at 2351)).

> 5. Conclusion

Given the deferential standard of review, and taking
into account the eight Booth factors to the extent they are
relevant, the court finds that the Plan Administrator made a
reasonable determination.  The Plan Administrator thus did not
abuse its discretion by denying Clark's disability claim.

V.

Based on the foregoing discussion, it is ORDERED as
follows:

1.   That defendant's motion for summary judgment be, and
     it hereby is, granted;

2.   That plaintiff's motion for summary judgment be, and
     it hereby is, denied; and

3.   That this action be, and it hereby is, dismissed.

The Clerk is directed to forward copies of this
written opinion and order to all counsel of record and any
unrepresented parties.

ENTER:     March 22, 2013

John T. Copenhaver, Jr.
United States District Judge

43